UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EAST COAST PLASTIC SURGERY, P.C.

                        Plaintiff,

    - Against -

AETNA HEALTH AND LIFE INSURANCE COMPANY,

                        Defendant(s).

Case No.: 23-7560

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff, EAST COAST PLASTIC SURGERY, P.C. (Collectively herein "the Plaintiff" or "The Provider(s)"), by and through their attorneys Lewin and Baglio, LLP, brings this complaint against AETNA HEALTH AND LIFE INSURANCE COMPANY, (herein after "Aetna") and alleges as follows upon knowledge as to themselves and their own actions and otherwise upon information and belief:

# THE PARTIES

1. Aetna is a corporation, and at all times mentioned herein was, a Connecticut corporation with its principal place of business in Hartford, CT.

2. Aetna is an insurer authorized to do business in New York State.

3. Aetna violated New York law while doing business in New York State.

4. Aetna does business within the SOUTHERN DISTRICT OF NEW YORK.

5. EAST COAST PLASTIC SURGERY, P.C. (herein after "ECPS") is a/an Professional Corporation existing and operating under the laws of the State of New

Jersey, with its principal place of business, mailing address and registered agent in RED BANK, NJ 07701. Its sole shareholder is Norman M. Rowe, M.D., whose domicile is New York County.

6. Non-party Dr. Lisa Schneider is affiliated with ECPS; ECPS is an entity through which non-party Dr. Lisa Schneider does business.

7. Non-party Dr. Lisa Schneider rendered medical services to Non-Party GP[1] for which ECPS sought payment from Aetna.

8. Non-Party Dr. Charles Pierce is affiliated with ECPS; ECPS is an entity through which non-party Dr. Charles Pierce does business.

9. Non-party Dr. Charles Pierce rendered medical services to Non-Party GP for which ECPS sought payment from Aetna.

## JURISDICTION AND VENUE

10. This Court has Subject Matter Jurisdiction pursuant to Title 28, Section 1332 of the United States Code (28 U.S.C. § 1332(a)), Diversity Jurisdiction; the parties are residents of different states and the amount in dispute is in excess of Seventy-Five Thousand Dollars ($75,000.00).

---

[1] GP are the initials of a consumer of Aetna's health insurance products.

# FACTUAL ALLEGATIONS

A.  **Background**

11.   ECPS is a plastic surgery practice. Non-party Dr. Lisa Schneider and Non-Party Dr. Charles Pierce were educated and trained at top surgical institutions. ECPS provides expertise in microsurgery. Non-Party Dr. Lisa Schneider and Non-Party Dr. Charles Pierce are trained in and implement the latest and most innovative techniques to reduce scarring and trauma from surgery. ECPS is widely regarded for their short-scar nipple saving breast reduction technique.

12.   GP needed reduction mammaplasty.

13.   Non-party Dr. Lisa Schneider determined GP was a candidate for reduction mammaplasty.

14.   At all relevant times, GP and Aetna shared the costs of medical services rendered by out-of-network provider(s)[2].

15.   Non-Party Dr. Lisa Schneider, Non-Party Dr. Charles Pierce, and ECPS are not part of any "provider network" organized by Aetna; Aetna treats them as non-participating provider(s), commonly known as out-of-network provider(s).

16.   Because there are no contracts between out-of-network providers and Aetna, Aetna determines the total amount of payment it will make to an out-of-

---

[2] See *Surprise Billing in Private Health Insurance: Overview of Federal Consumer Protections and payment for Out-of-Network Services* R46856 July 26, 2021, Rosso Shen & Isserman Congressional Research Digital Collection

network provider(s), and it is only after determining the proper amount Aetna owes can GP's share of the costs be calculated.

**B.     Dr. Lisa Schneider And Non-Party Dr. Charles Pierce And Aetna Enter Into An Ad-Hoc Agreement To Render Services To GP**

*1. Aetna Offered A Unilateral Contract*

17.     On or about 4/23/2020, an ECPS employee contacted Aetna using the phone number provided by Aetna for obtaining insurance payment and coverage information and spoke to a/an Aetna employee.

18.     The Aetna employee answered the phone number provided by Aetna for the purpose of obtaining insurance payment and coverage information. The Aetna employee who answered the phone number provided by Aetna was able to access Aetna's records for Aetna to provide information concerning GP's coverage, GP's deductible limits and out-of-pocket limits and whether or not those limits had been met.

19.     Based upon that conversation and prior dealings with Aetna, it was apparent to ECPS that Aetna's employee who served in this capacity had the authority to bind Aetna.

20.     During phone conversations between ECPS's employee(s) and Aetna's employee(s) concerning services to be rendered to GP, Aetna's employee represented that it would reimburse the services rendered to GP based upon 80% reasonable and customary.

21.     80% reasonable and customary is an industry pricing term that means Aetna would pay an amount equal to 80% of the UCR.

22. By representing that it would reimburse medical services at 80% reasonable and customary Aetna made a unilateral offer to reimburse services rendered by Non-Party Dr. Lisa Schneider and Non-Party Dr. Charles Pierce using 80% reasonable and customary to determine the amount of reimbursement, if any.

  a. *Aetna Offered A Price Expressed In Terms Of Commercial Practice And Trade Usage, An Acceptable Means Of Identifying A Price In New York*[3]

23. Typically, health insurers, like Aetna, determine the amount it pays to out-of-network providers using either of two methods: a UCR method or a Reference Based method.

24. The UCR method is when the insurer uses a percentile threshold of the costs for a service rendered by similar providers in the same geographic area or marketplace to price a claim for medical services.

25. The Reference Based method is when the insurer utilizes the Centers for Medicare and Medicaid ("CMS") pricing or other benchmark pricing methodologies to price a claim for medical services.

26. At all times, Aetna determines the data and method used to determine the amount it pays.

27. An insurer will typically disclose the allowed amount for a service rendered by an out-of-network provider as a percentage of UCR or a multiple of CMS; this is typically called the out-of-network rate or the OON rate.

---

[3] *Cobble Hill v. Henry & Warren*, 74 N.Y.2d 475 (1989)

28.   New York Insurance Law §§ 3217-a(a)(19)(B) requires insurers to disclose the amounts paid for out-of-network services as a percentage of UCR. New York Insurance Law §3217-a(f) states that the 80th percentile of providers' charge for a service in a geographic area is the usual and customary cost for that service.

29.   The 75th-80th percentile range of UCR is a percentile threshold recognized in the healthcare industry as a reasonable value for a medical service.

30.   FAIRHealth data is a benchmarking database maintained by a nonprofit organization that is recognized by the New York State Department of Financial Services and in the healthcare industry as a reliable source for provider pricing and for determining UCR.

### 2. *ECPS Accepted Aetna's Offer Of A Unilateral Contract By Performance*

31.   On June 10, 2020, ECPS accepted Aetna's offer by rendering bilateral breast reduction to GP.

32.   After rendering bilateral breast reduction ECPS submitted its billing to Aetna.

#### a. *Explanation Of Billing*

33.   ECPS billed Aetna a total of $300,000.00 for the services rendered on June 10, 2020 indicating the services it rendered using industry standard billing codes, known as "CPT codes." ECPS also substantiated the use of those CPT codes by including the relevant medical documentation with its billing.

34. It is industry standard practice for Aetna to rely upon the billing codes submitted by a medical provider to determine the amount Aetna would pay.

35. ECPS billed Aetna $150,000.00 for the services Dr. Lisa Schneider rendered and billed Aetna $150,000.00 for the services Dr. Charles Pierce rendered.

### 3. *Aetna Breaches The Agreement By Failing To Pay The Offered Price*

36. Aetna accepted ECPS's performance.

37. Upon receipt of the billing, Aetna partially performed its obligation by adjudicating the claims, determining that ECPS had a right to payment and then issued payment in the amount of $50,400.00 to ECPS for the services Dr. Lisa Schneider rendered and $3,726.91 to ECPS for the services Dr. Charles Pierce rendered.

38. Aetna partially performed its part of the agreement because it did not issue payment in an amount equal to 80% reasonable and customary.

39. Aetna did not deny ECPS's claim.

40. Aetna intentionally issued a payment that was less than what was offered and was late and unreasonable.

### C. Aetna's Automated Claims Processing Results In Underpaid Claims

41. Upon information and belief, Aetna has, as is common in the health insurance industry, largely automated its claims adjudication process.

42. Upon information and belief, Aetna has designed and implemented its automated claims adjudication process to ensure that claims for payment received by

Aetna for all services rendered by any out-of-network providers are intentionally underpaid.

43. Upon information and belief, Aetna intentionally underpays out-of-network services to artificially reduce gross costs for medical services and increase its profits.

44. Every dollar that Aetna was obligated to pay that it didn't pay was a dollar counted directly as profits.

45. While underpayment serves as a windfall for Aetna, being misled into providing medical services leaves the medical provider with a broken promise and the legal bills associated with attempting to be made whole again.

46. Upon information and belief, when Aetna processes the claims it receives it relies on the information reflected in the claim itself, and particularly the CPT code, to determine the date of service, the service provided to the consumer, and the medical provider's network status, i.e., participating provider or non-participating provider.

47. Upon information and belief, CPT codes are among the most important pieces of information included in a claim to Aetna, and a primary determinant of the amount Aetna will ultimately pay.

48. Upon information and belief, the type and degree of care indicated by the CPT code(s) included in a claim is a primary determinant of what Aetna will pay on the claim.

49. Upon information and belief, Aetna intentionally issues improper and reduced payment for services rendered by out-of-network providers.

50. The automated process means that Aetna routinely applies limitations on reimbursement improperly. The improper application of limitations on reimbursement improperly reduces the amount of Aetna's payment.

51. The delta between what Aetna paid on the claim identified in the Complaint and what Aetna should have paid is so substantial it forecloses the possibility that Aetna merely made a mistake.

D. **Aetna's Payment Was Unreasonable And Caused ECPS To Suffer Damages**

52. By paying $54,126.91 to ECPS, Aetna breached the contract.

53. $54,126.91 is not the amount agreed to and is not a reasonable value for bilateral breast reduction because it is not within the 75th-80th percentiles of UCR for bilateral breast reduction; as a result ECPS suffered damages.

54. Aetna did not use 80% reasonable and customary to calculate the payment for bilateral breast reduction, therefore, Aetna incorrectly calculated its payment to ECPS; as a result ECPS suffered damages.

55. Alternatively, Aetna intentionally incorrectly calculated 80% reasonable and customary resulting in an underpayment to ECPS; as a result ECPS suffered damages.

56. Aetna did not properly apply industry coding standards for determining limitations on reimbursement for the services rendered, therefore, Aetna incorrectly calculated its payment to ECPS; as a result ECPS suffered damages.

## COUNT ONE-BREACH OF CONTRACT

57. ECPS repeat(s) and re-allege(s) the foregoing paragraphs as if fully set forth herein.

58. ECPS and Aetna entered into a contract for Non-Party Dr. Lisa Schneider and Non-Party Dr. Charles Pierce to render medical services to GP.

59. Non-Party Dr. Lisa Schneider and Non-Party Dr. Charles Pierce provided all the medical services contracted for, but Aetna has failed and refused to pay ECPS for those services as agreed between the parties.

60. As a result of Aetna's actions ECPS has suffered damages in an amount to be determined by the trier of fact.

## COUNT TWO-UNJUST ENRICHMENT

61. ECPS repeat(s) and re-allege(s) the foregoing paragraphs as if fully set forth herein.

62. Aetna's failure to pay amounts due enriched them.

63. Aetna's retention of the unpaid amount for the medical services provided is improper, and it is against equity and good conscience to allow Aetna to keep the monies.

64. ECPS conferred a benefit upon Aetna under circumstances where Aetna knew or should have known that ECPS expected to be compensated for the benefit according to usual and customary prevailing rates for those services.

65. The benefit conferred upon Aetna was the benefit of its bargain, bilateral breast reduction and other medical services rendered to GP.

66. Aetna knew or should have known that ECPS expected to be reimbursed 80% reasonable and customary for the services rendered to GP because Aetna had reimbursed ECPS for the same service rendered to non-party beneficiaries at a rate substantially greater than the reimbursement issued to ECPS.

67. As a result of Aetna's actions ECPS suffered damages in an amount to be determined by the trier of fact.

## COUNT THREE- PROMISSORY ESTOPPEL

68. ECPS repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

69. Aetna made a clear and definite promise to reimburse the medical services provided by ECPS to GP at 80% reasonable and customary and should have expected that EAST COAST PLASTIC SURGERY, P.C. would rely upon that promise.

70. Aetna should have expected ECPS to rely upon its promise because, among other reasons, Aetna knew or should have known that that ECPS was going to provide all the medically reasonable and necessary services to perform bilateral breast reduction.

71. Aetna should have expected EAST COAST PLASTIC SURGERY, P.C. to rely upon its promise because, among other reasons, Aetna knew or should have

known that it had issued payment to ECPS under the same or similar circumstances for the same or similar services that were rendered to GP.

72. But for Aetna's agreement to reimburse the service at 80% reasonable and customary, ECPS would not have otherwise provided the surgery and the related medical services to GP.

73. Relying on Aetna's offer of reimbursement at 80% reasonable and customary ECPS forbore from collecting payment-in-full from GP prior to rendering reduction mammaplasty.

74. The Providers relied on Aetna's promise to their detriment.

75. As a result of Aetna's actions, The Providers have suffered substantial damages in an amount to be determined by the finder of fact.

## COUNT FOUR- FRAUDULENT INDUCEMENT

76. ECPS repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

77. With the intent to induce ECPS to enter into an ad-hoc agreement Aetna intentionally represented to ECPS that it would issue reimbursement based on 80% reasonable and customary for medical services rendered to its consumer.

78. When Aetna intentionally told ECPS that it was reimbursing bilateral breast reduction using "80% reasonable and customary" Aetna knew its claims processing system had no capacity to ensure the claims were paid using 80% reasonable and customary.

79. ECPS justifiably relied on Aetna's statements that it would reimburse their services using 80% reasonable and customary, and as a result rendered bilateral breast reduction to Aetna.

80. As a result of Aetna's willful and wanton conduct ECPS has been damaged.

81.     Based on Aetna's willful and wanton conduct Aetna should be punished to prevent Aetna from continuing this fraudulent practice.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff(s), EAST COAST PLASTIC SURGERY, P.C. demand respectfully prays this Court:

1.     Award Plaintiffs a judgment against Defendant in an amount to be determined at Trial to compensate Plaintiffs for all harm suffered, including but not limited to compensatory damages in the amount of $118,373.09, an award of punitive damages in an amount equal to treble the consequential damages, pre-judgment amount awarded together with granting interest, statutory interest, costs and expenses as well as all other damages provided by applicable law.

2.     Grant Plaintiffs such other and further relief as the Court may deem just and proper.

DocuSign Envelope ID: 1?0AC21A-196A-458C-984B-286C7F11E407
Case 3:23-cv-01173-VAB   Document 1   Filed 08/25/23   Page 15 of 15

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury in this action of all issues to triable.

DocuSigned by:

*Michael Baglio*
9A1D48C14A73421...

**LEWIN & BAGLIO, LLP**
By: Michael Baglio, Esq.
Attorneys for the Plaintiff
1100 Shames Drive, Suite 100
Westbury, New York 11590
Tel: (516) 307- 1777
Fax: (516) 307- 1770

L&B File No.: 2126.COM.86
